**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **EMD PERFORMANCE MATERIALS CORP.** | : | |
| | : | |
| | : | |
| v. | : | **CIVIL ACTION NO.  21-3050** |
| | : | |
| **MARQUE OF BRANDS AMERICAS LLC.** | : | |
| | : | |

---

**McHUGH, J.**                                                                    **January 6, 2022**

**MEMORANDUM**

      The case arises out of a contract to supply ingredients for a lotion that provides a skin tan without exposure to the sun. Plaintiff EMD Performance Materials brought this action against Marque of Brands Americas to collect unpaid, past due bills.  Marque disputes that any payment was late, based on what it contends was a previous course of conduct modifying the contract.  It further contends it was entitled to protect itself against EMD's conduct under the doctrine of anticipatory breach and asserts a counterclaim for damages.  In EMD's view, Marque owes EMD for the delivery of goods under individual invoices, independent of any obligations of breach under the underlying supply agreement, and that delivery made and accepted is sufficient grounds to justify judgment in its favor as to the purchase price of those goods.  It further argues that Marque's undisputed breach of their agreement entitled EMD to repudiate the contract, making Marque's defense of anticipated breach legally irrelevant, warranting dismissal of the counterclaim.  EMD brings the present motion for judgment on the pleadings as to Count I of its Complaint, seeking amounts owed on unpaid invoices that reflect the price of goods delivered and accepted by Marque plus contractual interest.  EMD also moves to dismiss Marque's Counterclaim that seeks damages for EMD's alleged refusal to continue supplying Marque. For the reasons that follow, I conclude that EMD is entitled to judgment as a matter of law on the two unpaid invoices that came due prior

to Marque's alleged notice of EMD's intent to breach.  I further conclude that Marque's material breach on the first two invoices entitled EMD to suspend performance under both the literal terms of the agreements and the applicable principles of Pennsylvania law, which defeats Marque's defense to the remaining invoices.  I will therefore grant EMD's motion for judgment on the pleadings and dismiss Marque's counterclaim.

## I.    <u>Factual Background</u>

For some time prior to October 2020, EMD sold Marque a certain chemical agent ("the Product") used in Marque's production of sunless tanning products.  Answer ¶¶ 3, 9.  It is not clear from the pleadings for how long this relationship lasted prior to its written formalization on October 15, 2020.  The written agreement was memorialized in a document entitled "Material Supply and Consignment Inventory Agreement" (hereinafter "Supply Agreement").  ECF 10, Ex. A.  The Supply Agreement included by annex a document entitled "General Terms and Conditions of Sale" (hereinafter "Terms & Conditions") provided by EMD.  ECF 10.  If there was any conflict between the Terms & Conditions and the Supply Agreement, the Supply Agreement was to govern.  Supply Agreement ¶ 12.1.

The Supply Agreement details a supply mechanism designed to ensure predictability of demand for EMD and predictability of supply for Marque while balancing the cost constraints and risks of both parties.  The Supply Agreement required EMD to provide a consignment inventory of the Product on Marque's premises.  *Id.* ¶ 2.1.  Marque had the right to withdraw from that consignment inventory at any time, *id.* ¶ 4.1, and would only be invoiced for the Product actually withdrawn, *id.* ¶ 4.6.  If the consignment inventory was running low, Marque could submit a Replenishment Purchase Order ("RPO") for expected delivery within forty-five to sixty days.  *Id.* ¶ 2.2.  EMD was to confirm any RPOs within five days of receipt.  *Id.*  In order to assist EMD in

2

anticipating Marque's needs, Marque was obligated to submit twelve-month forecasts of estimated Product purchases at the beginning of every month. *Id.* ¶ 3.6. EMD, in return, was obligated to "use commercially reasonable efforts to supply Product in the quantities ordered (subject to EMD's production capacity)." *Id*. ¶ 2.2. Under the terms of the Supply Agreement, Marque would send EMD a monthly report that detailed the amount of Product withdrawn during the course of the preceding month. *Id.* ¶ 4.4. Upon receipt of this report, EMD would "issue an invoice to [Marque] which shall be payable within sixty (60) business days of receipt by [Marque]." *Id.* ¶ 5.4. The Supply Agreement largely left management of the consignment inventory to Marque. *Id.* ¶¶ 3.1 – 3.5. However, it also provided EMD with "the right, at any time, to revoke in writing the authorization of Customer to make withdrawals from Consignment Inventory," *id*. ¶ 4.5, the right to inspect the inventory, *id.* ¶ 5.3, the right to have inventory in excess of forecasted purchases returned at the customer's cost, *id.* ¶ 5.5, and the right to the auditing and return of the entire consignment inventory upon cancelation or termination of the agreement, *id.* ¶ 5.6.

The Supply Agreement and the Terms & Conditions contained several additional terms that are relevant to interpreting the agreements, and to Marque's contention that the terms were in some sense altered by the parties' course of conduct. First, the Supply Agreement contained an integration clause that included the Terms & Conditions as part of the agreement but excluded and superseded "any prior or contemporaneous written or oral communications, statements, or agreements between the Parties relating to such subject matter." *Id.* ¶ 12.1. This clause also included a written modification provision stating that "[a]ny changes or amendments to this Agreement must be in writing signed by authorized representatives of both Parties." *Id.* Second, the Supply Agreement contained a no-waiver provision stating that "[t]he failure of either Party to take action as a result of a breach of this Agreement by the other Party will constitute neither a

waiver of the particular breech involved nor a waiver of either Party's right to enforce any or all provisions of this Agreement through any remedy granted by law or this Agreement." *Id.* ¶ 12.11. Finally, the agreement contains several clauses that purport to limit damages essentially to the purchase price of the goods, excluding various categories of damages such as consequential, incidental, special, punitive, indirect, and exemplary damages. *See id.* ¶¶ 6.6, 6.7; Terms & Conditions ¶ 7.3.

The Supply Agreement also set forth the terms relevant to the breaches alleged by the parties, including the rights that would accrue to the injured party. The parties agreed that "[a] delay of payment by [Marque]" would constitute material breach by Marque. *Id.* ¶ 8.3. Such a breach would allow EMD to issue notice and demand payment that, if not provided within thirty days, would entitle EMD to terminate the agreement. *Id.* Two additional provisions permitted EMD to suspend performance of filling RPOs if Marque was in material breach of the agreement. First, the Supply Agreement provided that "[e]ven after the delivery of an order confirmation by EMD, the obligation to deliver … is contingent upon Customer's compliance with the terms and conditions of this Agreement … ." *Id.* ¶ 5.2. Second, the Terms & Conditions stated that "[i]n case of delay of payment by Purchaser, EMD reserves [the right to] … terminate the order or suspend any further deliveries to Purchaser." Terms & Conditions ¶ 4.5. That same provision entitled EMD to "interest on all amounts due and unpaid after due date … at least 8% p.a. above the published prime rate of Bank of America …" in the event of a delay in payment. *Id.*

The factual dispute is relatively straightforward. In the simplest terms, Marque failed to pay several invoices within sixty days as provided in the Supply Agreement, and EMD demands satisfaction. EMD lists the past due invoices at Complaint ¶ 47, which I recapitulate:

| Invoice No. | Invoice Date | Due Date | Amount |
|---|---|---|---|
| 90767376 | 01/08/21 | 03/09/21 | $72,680.00 |
| 90784747 | 02/03/21 | 04/04/21 | $112,654.00 |
| 90802636 | 03/03/21 | 05/02/21 | $65,412.00 |
| 90816313 | 03/18/21 | 05/17/21 | $20,769.00 |
| 90815484 | 03/18/21 | 05/17/21 | $43,008.00 |
| 90841500 | 05/03/21 | 07/02/21 | $196,236.00 |
| 90853492 | 05/21/21 | 07/20/21 | $159,896.00 |
| Credit Memo | Rebate | | ($36,259.00) |

Marque admits that it has not remitted payment on these invoices, Answer ¶¶ 47-48, and that the invoices remain outstanding, *id*. ¶ 44.

As will be discussed in greater detail below, Marque seeks to present a more complicated story. Marque first alleges that the parties' course of conduct, both before and after formalizing the Supply Agreement, makes the sixty-day payment due date stated at ¶ 5.4 of the Supply Agreement unenforceable, and excuses Marque's failure to pay the past due invoices. *See, e.g.*, Answer ¶ 45. It should be noted that a due date corresponding to the agreement appeared on each invoice. ECF 10-1. Second, Marque claims that around April 21, 2021, after two of its invoices were already past due under the specific terms of the Supply Agreement, EMD communicated to Marque its intention to breach the Supply Agreement, in a bad faith effort to channel its production efforts away from the Product into more profitable lines of production. Counterclaim ¶¶ 40-47. In the Counterclaim, Marque specifically alleges that during that call, EMD informed Marque that "EMD had intentionally diverted its production/acquisition efforts and resources away from the Product and to other products." *Id.* ¶ 41.[1] Despite these allegations and despite Marque's non-payment on at least two of its invoices, EMD continued performance by approving three RPOs for a total of 22,500 kilograms of the Product. *Id.* ¶¶ 50-51. On May 18, 2021, EMD canceled all

---

[1] This allegation is somewhat inconsistent with Marque's position at oral argument that EMD's reason for repudiation was that "EMD, at that point in April, knew that it could redirect its supply of product to other buyers at a better cost." Hearing Trans. 19:16-18.

outstanding RPOs, which Marque contends constituted EMD's repudiation of the agreement and justification for Marque's anticipatory breach in withholding further payments. *Id.* ¶¶ 48-54.  A letter sent by EMD to Marque on May 14, 2021, shows that EMD's stated reason for canceling the RPOs was that Marque was more than two months late in payment on the first past due invoice. ECF 10-2.  This letter also demanded that Marque pay its past due balances, that it provide assurances of its financial resources, that Marque cease making withdrawals from the consignment inventory; and that the agreement would be terminated in thirty days if Marque failed to cure its breach.  *Id.*  Additional letters were exchanged, including another letter from EMD on June 11, 2021, which reaffirmed that the agreement would terminate on June 14 pursuant to the notice given in a prior letter, demanded the outstanding balance, and demanded the auditing and return of the remaining consignment inventory.  ECF 10-3.

## II.   Standard of Review

As to EMD's motion seeking dismissal of Marque's counterclaim for breach of contract, Fed.  R.  Civ.  P.  12(b)(6) governs, as set forth in *Fowler v.  UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir.  2009).

As to EMD's Motion for Judgment on the Pleadings, it is analyzed under the same standards that apply to a Rule 12(b)(6) motion.  *Wolfington v.  Reconstructive Orthopaedic Associates II PC*, 935 F.3d 187, 195 (3d Cir.  2019) (cleaned up).  The court will "view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Id.*  "Under Rule 12(c), judgment will not be granted unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290 (3d Cir. 1988).  A motion for judgment on the pleadings is properly granted in a contract case if the

moving party clearly establishes that it is entitled to judgment as a matter of law.  *DiCarlo v.  St. Mary Hosp.*, 530 F.3d 255, 259 (3d Cir 2008).

Because this motion largely turns on reading the contracts at issue, it is important to preface the discussion with some basic principles and standards of review as to the law of contracts in Pennsylvania.[2] To the extent the contractual language is unambiguous, I can interpret it as a matter of law.  *Kripp v. Kripp*, 849 A.2d 1159, 1163 (Pa.  2004).  Where it is ambiguous and susceptible to different constructions, that presents a factual matter.  *Id.*  The scope of a contract can also present a factual question that looks to the parties' intent and the conduct of the parties subject to the contract.  *See, e.g., Giannone v.  Giannone,* 429 F.  Supp.  3d 34, 40 (E.D.  Pa.  2019).  When interpreting the contract, "the entire contract should be read as a whole, our interpretation must seek to give effect to all of its provisions, and we will not interpret one provision of a contract in a manner which results in another portion being annulled." *Commonwealth by Shapiro v.  UPMC*, 208 A.3d 898, 911 (Pa.  2019) (cleaned up).

### III.  <u>Discussion of Procedural Posture</u>

A.  <u>Consideration of the Documents Attached to EMD's Brief</u>

Marque contends that the motion for judgment on the pleadings should be converted into a motion for summary judgment because EMD has based its motion on documents that were not attached to the original Complaint.  Marque Br., at 5-6.[3] "[I]n deciding a motion for judgment on

---

[2] The parties do not dispute that the contracts at issue are valid and binding or that the invoices reflect goods sold by EMD and accepted by Marque.  They do not dispute that EMD can claim damages for the payment owing on the sale of goods pursuant to 13 Pa.C.S.A  § 2709, although EMD does dispute that Marque is entitled to any damages cognizable under damages limitations clauses in the agreement.  The controlling issue in this case is which party is in breach of the agreement.  *See Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C.  v.  Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (2016) (reiterating elements of breach of contract in Pennsylvania).

[3] Marque originally contended that it was unable to authenticate the documents filed as attachments to EMD's motion.  That issue has apparently been cured.  In EMD's reply, EMD represents to the Court that

the pleadings, a court may only consider the complaint, exhibits attached to the complaint, matters of public record, as well as *undisputedly authentic documents if the complainant's claims are based upon these documents*." *Wolfington*, 935 F.3d at 195 (emphasis added).  Documents that the complaint is based on include those that are "integral to or explicitly relied upon in the complaint." *Id.*  Here, the documents at issue include the Supply Agreement, ECF 10 (under seal), the Terms & Conditions, ECF 8-1, Ex. C, and nineteen pages of invoices and credit memos from January 8, 2021, to May 21, 2021, ECF 10-1 (under seal).  They also include two letters from EMD to Marque, the first from a business person, ECF 10-2 (under seal), and the second from a lawyer, ECF 10-3 (under seal).  All of these documents are directly cited in the Complaint.  The agreements are cited by section number multiple times, Complaint ¶¶ 11-32*,* the invoices form the basis for a summary table of monies owed, *id.* ¶ 47, and the letters receive their own headings with expansive summaries, *id.* ¶¶ 33-43.  The Counterclaim also relies extensively on the Supply Agreement. Counterclaim ¶¶ 14-30.  It is therefore clear that the Complaint was based on the documents that EMD attaches to its Motion for Judgment on the Pleadings and these documents are therefore properly considered by the Court.[4]

---

"Marque confirmed that it is not challenging the authenticity of any of the documents related to the Motion." EMD Reply, at 2 n.2.  Marque has not filed a surreply to contest this statement of their position nor did it raise the issue in oral argument, so I will accept the documents as undisputedly authentic for purposes of this motion.  On their face these documents appear to be what EMD contends they are.

[4] Marque does not request that the motion to dismiss also be converted into a motion for summary judgment. Marque Br. at 6.  But, it cites Rule 12(d) as providing that both Rule 12(b)(6) and Rule 12(c) may be converted.  Nevertheless, because the standard for determining whether documents not filed with the complaint are appropriately considered under a Rule 12(b)(6) motion is the same standard as for Rule 12(c), they are appropriately considered in my ruling on the motion to dismiss as well.  *See Pension Ben. Guar. Corp. v. White Consol. Industries, Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

B.  The Ripeness of the Rule 12(c) Motion

Marque also raises a ripeness issue as to the Rule 12(c) motion.  It argues that the pleadings are not closed as required by Rule 12(c) because EMD has not filed an answer to Marque's Counterclaim.  Under Rule 12(c), EMD has moved only as to its own claims, to which Marque has filed an answer and for which further pleadings are closed.  It invokes Rule 12(b)(6) as to Marque's counterclaim, for which pleadings are still open.  I agree with the view set forth in Moore's Federal Practice, "[a]lthough [a Rule 12(c)] motion is typically available only when all pleadings have been served and filed, if all the pleadings for the claims or defenses to which the motion is addressed have closed, the fact that some pleadings remain for later filing does not preclude a motion for judgment on the pleadings." § 12.38 (2021). Here, because the issues to be decided on the Rule 12(c) motion have been joined in the pleadings and there will be no prejudice to either party in consideration of the motion, I will treat it as ripe.[5]

---

[5] Although there isn't extensive caselaw or analysis on this point, generally courts consider two factors in deciding whether a motion for judgment on the pleadings is ripe despite some aspects of the pleadings still being open: (1) if the issues being decided have been sufficiently joined in the pleadings, and (2) if there will be prejudice to the non-movant.  Here, although the Counterclaim is closely related to the claims at issue in the Complaint and Answer, its allegations merely expand and provide further details to those claims. *See, e.g., Hodgson v. Kottke Associates, LLC*, CIV.A 06-5040, 2007 WL 2234525, at *3 n.1 (E.D. Pa. Aug. 1, 2007) (construing Rule 12(c) motion as "addressed solely at the allegations made in the Complaint, which has been answered, and does not rely on the Counterclaim for its contentions"); *Starmakers Pub. Corp. v. Acme Fast Freight, Inc.*, 615 F. Supp. 787, 791 (S.D.N.Y. 1985) (finding "joinder of issue" accomplished for purposes of Rule 12(c) by the filing of the answer and the complaint).  It is also clear that there will be no prejudice in considering the motion at this time.  First, non-movant Marque has filed all the pleadings it is entitled to and suffers no prejudice from EMD not filing an answer to the Counterclaim at this juncture. *See NanoMech, Inc. v. Suresh*, 777 F.3d 1020 (8th Cir. 2015) (finding no prejudice in district court's conversion of motion to dismiss into motion for judgment on the pleadings).  Second, both the Rule 12(b)(6) and the Rule 12(c) motions are governed by the same standards of review under which I will construe all facts and related inferences in favor of Marque, such that no prejudice can result from the standard of review.  *See Zenith Ins. Co. v. Newell*, 527 F. Supp. 3d 778, 784 n.4 (E.D. Pa. 2021).

Furthermore, as a matter of judicial efficiency, I am disinclined to dismiss the Rule 12(c) motion as untimely, when the practical result is that an identical motion gets refiled after EMD files a conclusory answer that doesn't substantially advance the pleading record.  When considering a Rule 12(c) motion that was complained of as being filed *too late*, the Third Circuit has suggested that prejudice is the primary criterion, noting that "[g]enerally, matters of docket control, like whether to consider a motion are

## IV. **Substantive Analysis of the Legal Claims**

A. Marque's Right to Offset Damages under 13 Pa.C.S.A. § 2717

As an initial matter, I note that the core damages requested by EMD are requested pursuant to 13 Pa.C.S.A. § 2709,[6] which permits a seller to recover the price of goods accepted by the buyer. Marque does not dispute EMD's underlying right to recover the price of goods but claims that 13 Pa.C.S.A. § 2717, which allows offsets from payment for damages "under the same contract," permits it to withhold payment to offset damages caused by EMD's alleged breach of the underlying Supply Agreement. EMD's leading argument is then that the Supply Agreement and the invoiced withdrawals of the Product from the consignment inventory are separate and distinct contracts such that Marque has no right under § 2717 to withhold offsets and remains owing on all outstanding invoices. *See* EMD Br. at 10-15; EMD Reply at 4-6; Hearing Trans. 4:15-8:6, ECF 18. In EMD's view, because § 2717 does not apply, the Court need not address Marque's anticipatory breach defense in deciding the 12(c) motion as any putative damages to Marque cannot legally justify withholding the underlying payments as offsets.

Contrary to EMD's repeated assertions, it is not "well-settled law that invoices/purchase orders and overarching supply agreements are not the same contract for the purpose of setoff" under § 2717. EMD Br. at 13. EMD's lead case on the matter, *Hellendall Distributors, Inc. v. S.B. Thomas, Inc.*, 559 F. Supp. 573 (E.D. Pa. 1983), *aff'd per curiam without opinion*, 755 F.2d 920

---

[6] EMD makes this Count I of the Complaint and technically brings it pursuant to UCC § 2-709. The Pennsylvania legislature has implemented this provision of the UCC at 13 Pa.C.S.A. § 2709, and as the agreements governing these transactions have Pennsylvania choice of law provisions, the relevant law to apply is the Pennsylvania statute.

committed to the sound discretion of the district court. We … will not interfere with a trial court's control of its docket except upon the clearest showing that the procedures have resulted in actual and substantial prejudice to the complaining litigant." *PDX N., Inc. v. Commr. New Jersey Dept. of Lab. and Workforce Dev.*, 978 F.3d 871, 880 n.6 (3d Cir. 2020), *cert. denied sub nom. PDX N., Inc. v. Asaro-Angelo*, 20-1327, 2021 WL 4507638 (U.S. Oct. 4, 2021).

(3d Cir. 1985), does—to EMD's credit—make a finding as a matter of law that UCC § 2-717 doesn't apply to goods sold under distributorship agreements.[7] It does so, however, in a conclusory fashion with no explanation or legal reasoning.  It cites, presumably as persuasive, a New York state appellate court that refused to apply § 2-717 on summary judgment, but the facts are wholly distinct from the present case, because there "*no underlying contract was ever demonstrated*." *Sharp Elecs. Corp. v. Arkin-Medo, Inc.*, 452 N.Y.S.2d 589, 590 (N.Y. App. Div. 1st Dept. 1982), *aff'd,* 448 N.E.2d 799 (N.Y. 1983) (emphasis added). The court in *Sharp* specifically distinguished it from controlling precedent of the New York Court of Appeals which held that under UCC § 2-717, "a buyer may defeat or diminish a seller's substantive action for goods sold and delivered by interposing a valid counterclaim for breach of the underlying sales agreement." *Created Gemstones, Inc. v. Union Carbide Corp.*, 391 N.E.2d 987, 989 (N.Y. 1979).  The facts in *Created Gemstones*, highly similar to those here, featured an underlying supply agreement with minimum annual purchase and supply obligations where the buyer withheld payments to recover on damages arising from the seller's refusal to supply the goods in accordance with the underlying agreement. *Id.* at 988.

There is no binding Pennsylvania or Third Circuit precedent on how to interpret § 2717. Under UCC § 2-717, Illinois and Massachusetts appear to have adopted a fairly bright-line application against treating underlying "distributor" agreements as the same as purchase orders made pursuant to those agreements.[8]   In contrast,  New York, following *Created Gemstones* and

---

[7] Although 13 Pa.C.S.A. § 2717 had been enacted at the time of *Hellendall*, it is not clear why the court there applied the UCC provision without reference to the Pennsylvania statute.

[8] *See Schieffelin & Co. v. Valley Liquors, Inc*., 823 F.2d 1064, 1068 (7th Cir. 1987) (distributorship agreement not the same contract as purchase orders where "price, type, and quantity of goods sold resulted from accepted purchase orders and not from the distributorship agreement."); *Travenol Laboratories, Inc. v. Zotal, Ltd*., 474 N.E.2d 1070 (Mass. 1985); *C. R. Bard, Inc. v. Med. Elecs. Corp.*, 529 F. Supp. 1382 (D. Mass. 1982).

a series of other cases that treat the issue as a factual question not appropriate for summary resolution, has adopted a more case specific approach.[9] Still other courts have applied a severability analysis under state contract law to determine whether individual transactions are part of the same contract or not.[10] Both state and federal district courts applying Pennsylvania law, rather than following a bright-line rule, appear to consider how the terms and obligations of the contracts and transactions in question relate to one another in order to make a legal determination as to whether they are part of the "same contract" or not.[11] That seems the best course to follow here where the nature of the parties' business relationship utilized a consignment inventory mechanism that appears distinct from a more traditional "distributor" agreement as found in most of the case law.

The Supply Agreement provides a thorough litany of terms governing the creation and maintenance of the consignment inventory, Supply Agreement ¶¶ 2.1-2.4, 3.3, 3.5, the replenishment of the consignment inventory through un-invoiced replenishment orders, *id.* ¶¶ 2.2, 5.1, 5.4, regular reporting on anticipated supply needs on a 12-month rolling forecast, *id.* ¶¶ 3.5-

---

[9] *See Created Gemstones, Inc.*, 391 N.E.2d at 987; *Frank L. Savage, Inc. v. Alan Paine, Ltd.*, 540 N.Y.S.2d 239, 239-40 (N.Y. App. Div. 1st Dept. 1989) ("[W]here unresolved factual issues create a doubt as to whether an exclusive distributorship agreement underlies a counterclaim for goods sold and delivered and whether such agreement was breached by the seller, partial summary judgment may not be granted").

[10] *See, e.g., Reser's Fine Foods, Inc. v. H.C. Schmieding Produce Co., LLC*, 16-4150-SAC, 2017 WL 4099480, at *7 (D. Kan. Sept. 15, 2017); *Sencon Sys., Inc. v. W.R. Bonsal Co.*, 85 C 8250, 1986 WL 10989, at *1-2 (N.D. Ill. Sept. 29, 1986).

[11] *See, e.g., Honey Creek Stone Co. v. Telsmith, Inc.*, 11347 OF 2003, C.A., 2009 WL 6371627 (Pa. Com. Pl., Law. Cty. Dec. 31, 2009) (contract for replacement parts same contract as original agreement to purchase equipment); *JHNY Corp. v. Dana Corp.*, 2:05-CV-02829-LDD, 2005 WL 8177288, at *3 (E.D. Pa. Dec. 28, 2005) (separate purchase orders were not the same contract); *Total Foods Corp. v. Wilfran Agr. Industries, Inc.*, 945 F. Supp. 100, 102 (E.D. Pa. 1996) (supply agreement for milk protein separate from purchase orders for extra grade whey because "[t]hey concern different subject matter, were executed in different years, and have different terms"); *Carlisle Corp. v. Uresco Const. Materials, Inc.*, 823 F. Supp. 271 (M.D. Pa. 1993) (distributor agreement that "broadly set[] forth payment terms and the right of termination" merely "created a potential for future sales" with actual quantities and prices set by the purchase order and invoice).

3.7, rights of withdrawal from the consignment inventory, *id.* ¶¶ 3.5-3.7, minimum and exclusive purchasing obligations, *id.* ¶ 3.5, and obligations to supply requested amounts of the Product, *id.* ¶¶ 2.2, 5.1.  This is not a generic set of terms and conditions that apply only to discrete purchase orders individually processed and shipped from a warehouse upon receipt, but a more formal relationship contemplating a continuous and obligated flow of Product supplied through a consignment inventory projected into the future through rolling forecasts.  Individual invoices and RPOs may have captured discrete moments in this flow, but that flow relates to the Supply Agreement. They cannot be extricated from it. Perhaps the most pivotal fact with respect to these agreements is that the delivery of goods *preceded* the invoices for payment and occurred pursuant to the rights granted to Marque under the Supply Agreement.  That is, Marque withdrew the Product from the consignment inventory as needed, *id.* ¶ 4.1, and then sent EMD an inventory report at the end of the month that detailed the amount of Product withdrawn, *id.* ¶ 4.4, on receipt of which EMD issued Marque an invoice payable within sixty days for the goods withdrawn, *id.* ¶ 5.4.  Unlike the case of a more traditional distributorship agreement, such as that considered by the Seventh Circuit in *Schieffelin & Co. v. Valley Liquors, Inc.*, 823 F.2d 1064 (7th Cir. 1987), "the price, type, and quantity of goods sold" *did not* result solely from purchase orders, which here merely replenished the consignment inventory, but instead directly resulted from the terms of the Supply Agreement itself under which Marque withdrew and was charged for the Product. Under Pennsylvania law's severability analysis, which looks to the intent of the parties regarding severability, individual withdrawals and invoices are thus not severable from the Supply Agreement. *See Jacobs v. CNG Transmission Corp.*, 772 A.2d 445, 236 (Pa. 2001).  I therefore conclude that the Supply Agreement is part of the same contract for purposes of 13 Pa.C.S.A. § 2717.

This affects the analysis in two ways.  First, EMD's motion must be viewed through the prism of the Supply Agreement, and not simply as a statutory claim to recover for the cost of goods accepted.  Second, to the extent Marque could legally establish damages,[12] § 2717 would permit Marque to withhold payment to satisfy those damages.  Ultimately, however, as discussed below, the Supply Agreement does not protect Marque  from its failure to pay.

B.  Marque's Material Breaches Gave EMD the Right to Repudiate the Supply Agreement

Even though §2717 applies, Marque's material breaches occurred before any possible breach by EMD.[13]  EMD contends that Marque was in material breach of the agreement as soon as it failed to pay EMD within sixty days of invoicing for product withdrawals and remains owing on those sums and contractual interest.  Marque contends that the agreement's sixty-day payment deadline must be interpreted in light of the parties' prior conduct which absolves any payment delays and that EMD's alleged bad faith repudiation of the contract justifies Marque's continued refusal to pay and in fact warrants an offset of consequential damages.

First, I will address the two invoices that came due prior to Marque's allegation that on April 21, 2021, EMD notified Marque that it intended to breach the agreement between them. Counterclaim ¶¶ 40-43.  The collectability of these invoices is potentially limited only by Marque's

---

[12] Both the Supply Agreement and the Terms and Conditions include extensive limitations on damages that largely appear to exclude almost any claimed damages except as to the value of the goods themselves. *See* Supply Agreement ¶¶ 6.6, 6.7; Terms & Conditions ¶ 7.3.  Marque argues that these provisions should not apply here given the claims that EMD acted in bad faith when it allegedly breached the agreement. Marque Br. 16-19.  Because I find below that EMD did not breach the agreement, I need not decide this issue.

[13] EMD has brought their motion for judgment on the pleadings only as to Count I of the Complaint, requesting as its remedy the payment of the unpaid invoices plus contractual interest. As held above, that claim must be evaluated in accordance with the terms of the Supply Agreement. Separately, EMD seeks dismissal of Marque's Counterclaim for breach, which mirrors Marque's affirmative defense of anticipatory breach to Counts I and II of the Complaint. Given my conclusion that the Supply Agreement must be considered even as to Count I of EMD's Complaint, assessing the parties' respective allegations of breach of that agreement is thus relevant to determining both EMD's right to judgment on the pleadings as to Count I and the dismissal of Marque's Counterclaim.

"course of dealing" defense that allegedly absolved Marque from paying on time. They are not subject to Marque's anticipatory breach defense because they came due prior to the alleged breach giving rise to that defense. I conclude that the course of dealing defense fails because the payment terms of the agreement are unambiguous and the parties' conduct does not supplement or explain those terms. As to the remaining invoices subject to Marque's anticipatory breach defense, I conclude that Marque's failure to pay the initial two invoices put it in material breach of the Supply Agreement. This in turn is fatal to its anticipatory breach defense because the material breach entitled EMD to suspend performance and terminate the agreement.

    1.  <u>The Invoices Due March 9, 2021 and April 4, 2021</u>

The initial two invoices were issued on January 8, 2021 and February 3, 2021. Complaint ¶ 47. Marque admits that it has not paid those invoices. Answer ¶¶ 47-48. The express terms of the Supply Agreement required payment within sixty days of receipt of the invoices. Supply Agreement ¶ 5.4. Therefore, the due dates for these two invoices were, respectively, March 9, 2021, and April 4, 2021.[14] These dates are relevant because Marque alleges that it first had notice of EMD's intent to repudiate the Supply Agreement for improper purposes on April 21, 2021. Countercomplaint ¶¶ 40-43. Thus these invoices were due prior to the date that Marque's anticipatory breach and setoff defenses matured, and therefore the only legal question as to these two invoices is whether the express sixty-day payment terms of the Supply Agreement applies or if Marque's cursory allegations as to the parties' course of conduct impacts the interpretation of the express terms in such a way that "Marque was not required to strictly adhere to ... a sixty-day payment deadline." Marque Br. at 6.

---

[14] Marque does not dispute that it received the invoices on the dates EMD alleges they were issued.

Marque does not merely argue that the course of conduct between the parties "modified" or "waived" the express terms of the agreement.  To do so, it would first have to show waiver of the written-modification requirement of the agreement, and then meet the more stringent statutory requirements of 13 Pa.C.S.A §§ 2209 and 1303(f).  Instead, pursuant to 13 Pa.C.S.A § 2202, Marque argues that the parties' course of conduct "explains" or "supplements" the express terms of the agreement.  Section 2202 of Pennsylvania's adoption of the Uniform Commercial Code states that the terms of an agreement relating to the sale of goods "intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but *may be explained or supplemented* ... by course of performance, course of dealing or usage of trade." (emphasis added).  Section 1303(e) further provides that "[e]xcept as otherwise provided [regarding waiver or modification of the agreement], the express terms of an agreement and any applicable course of performance, course of dealing or usage of trade must be construed whenever reasonable as consistent with each other.  If such a construction is unreasonable … express terms prevail over course of performance, course of dealing and usage of trade."

The terms of the agreement state that "[u]pon receipt of the Consignment Inventory Report from Customer, EMD shall issue an invoice to Customer which shall be payable within sixty (60) business days of receipt by Customer."  Supply Agreement ¶ 5.4.  Importantly, given the nature of Marque's argument, the Supply Agreement also provides that "the failure of either Party to take action as a result of a breach of this Agreement by the other Party will constitute neither waiver of the particular breach involved nor a waiver of either Party's right to enforce any or all provisions of this Agreement." *Id.* ¶ 12; *see also* Terms & Conditions, ¶ 10.12 (similar).  Against this, Marque alleges that "[p]rior and subsequent to entry into the Agreement, Marque and EMD developed a

course of dealing and a course of performance of the Agreement such that EMD did not strictly enforce—and thus Marque was not required to strictly adhere to—a sixty-day payment deadline for the payment of invoices." Marque Br. at 6 (quoting Answer ¶ 37).  As noted, Marque makes this argument pursuant to 13 Pa.C.S. § 2202 which allows the use of parol evidence only to explain or supplement express contractual terms, which is far different than a contention that the express terms of the contract were waived or modified by oral agreement.[15]  The question then is whether the express sixty-day payment provision, alongside a provision disclaiming waiver in the event of non-enforcement of the provision, can be reasonably interpreted "as consistent with" the alleged permissive late payment course of conduct or performance, because, as set forth in the Code, "[i]f such construction is unreasonable" the terms of the contract will govern as a matter of law.[16]

On the face of it, an express term providing EMD with the right to collect payment sixty days after invoicing is not easily reconcilable with Marque's claim to be able to waive that deadline

---

[15] The relevant Pennsylvania commercial code provisions as to waiver or modification are found at §§ 2209 and 1303(f).  In order to succeed under a waiver or modification argument, Marque would, as a threshold matter, have to show that the parties' conduct demonstrates a clear intent to waive the written-modification requirement of the contract.  The written-modification requirement is found in the Supply Agreement ¶ 12.1 and the Terms & Conditions ¶ 10.5.  Although Pennsylvania courts may permit parties to waive a written-modification requirement, they only do so where "the parties' conduct clearly shows the intent to waive the requirement."  *Accu-Weather, Inc. v. Prospect Commun., Inc.*, 644 A.2d 1251, 1255 (Pa. Super. 1994).  Both agreements also contain clauses expressly disclaiming waiver in the event that, as Marque claims happened here, one party fails to enforce a breach.  Supply Agreement ¶ 12.11 ("[T]he failure of either Party to take action as a result of a breach of this Agreement by the other Party will constitute neither waiver of the particular breach involved nor a waiver of either Party's right to enforce any or all provisions of this Agreement."); *see also* Terms & Conditions, ¶ 10.12 (similar).  Read together, these provisions imply that EMD's alleged failure to enforce a late-payment breach cannot be construed, on its own, as clear intent to waive the written-modification requirement.  Marque has alleged no other conduct or discussions among the parties to show that the parties otherwise had any intent to modify the written modification requirement, such that they could then evince an intent to modify the payment terms.

[16] At oral argument, Marque's counsel argued that "whether or not a course of performance is reasonable or unreasonable necessitates discovery" and "needs facts." Hearing Trans. 28:22-29:2.  But this misstates the standard.  As noted, under § 1303(e), "the express terms of an agreement and any applicable course of performance, course of dealing or usage of trade *must be construed whenever reasonable as consistent with each other*."  This is a legal question of contract construction and interpretation, it is not a factual question as to whether a specific course of performance is, in itself, reasonable.

at its own election.  The terms of this provision are straight-forward and unambiguous.  "When a writing is clear and unequivocal, its meaning must be determined by its contents alone." *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A2d.  418, 429 (Pa. 2001).  Whether Marque is contesting that the course of conduct explains the term "shall be payable" or the deadline of "sixty days" is not clear.  But in either case, Marque's claimed right to pay at a time of its own choosing would effectively nullify EMD's right to collect payment in a timely fashion or to collect interest on unpaid amounts owing.  *See* Terms & Conditions ¶ 4.5 (interest provision).  And "we will not interpret one provision of a contract in a manner which results in another portion being annulled." *LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 648 (Pa. 2009).

To Marque's detriment, its factual allegations and its brief provide no clarity as to how the specific course of conduct of the parties could reasonably be interpreted as explaining or supplementing the unambiguous payment deadline terms.  First, the allegations appear to encompass two separate time frames.  "Marque repeatedly alleges in its Answer that '*[p]rior and subsequent to entry into the Agreement*, Marque and EMD developed a course of dealing and a course of performance of the Agreement such that EMD did not strictly enforce—and thus Marque was not required to strictly adhere to—a sixty-day payment deadline for the payment of invoices." Marque Br. at 6 (citing Answer ¶¶ 37, 43, 44, 45, 47, 48, 69, 70, 74; Affirmative Defenses ¶ 22; Counterclaim ¶ 39) (emphasis added). With respect to the alleged course of conduct *prior* to the entry into the Supply Agreement, the Supply Agreement's integration clause expressly "supersedes any prior … agreements between the Parties relating to such subject matter." ¶ 12.1. Under Pennsylvania law, the parol evidence of prior dealings is inadmissible "to show an intent at variance with the language of the written agreement," which is the case here where the express

terms are unambiguous and require payment sixty days after invoicing.  *In re Carter*, 134 A.2d 908, 912 (Pa. 1957) (citing Restatement (Second) of Contracts § 238(a)).[17]

As to any course of conduct following the signing of the Supply Agreement, Marque's allegations are simply too vague and conclusory to support Marque's argument that EMD's alleged non-enforcement of the sixty-day payment deadline *explains* or *supplements* the express terms of the agreement.  And even if I were to accept that for some period EMD acted with forbearance, Marque would also need to point to conduct modifying the provisions that disclaim waiver in instances of non-enforcement.  While I must accept non-movant Marque's allegations as true and view all facts in Marque's favor, Marque must still put forth a plausible basis to support its defense that its factual parol evidence supplements the terms of the agreements.  Necessarily, Marque has invoices and payment records within its possession that it could draw from, but it fails to cite any specific payment deadlines that were missed, the lengths of time permitted to make their accounts current, the sizes of the invoices owed, or any communications regarding these alleged late payments.  This lack of detail makes it particularly difficult to surmise how the putative parol evidence provides any insight into the terms of the contract here.[18]   It is not the Court's

---

[17] Although the parties neither plead nor brief the point, I note for the record that there is a discrepancy in the payment deadline between the Terms & Conditions ¶ 4.4, which requires 30-day payment, and the Supply Agreement ¶ 5.4, which requires 60-day payment.  The Supply Agreement includes a provision indicating that the Supply Agreement should govern in the case of conflict between the two agreements. *Id.* ¶ 12.1.  If anything, this discrepancy may cut against Marque to the extent that it suggests that the 60-day deadline included in the negotiated Supply Agreement, superseding the standard form 30-day deadline, was meant to reflect a specific understanding at to the outside limit for payment.

[18] While my principal finding is that the allegations as pleaded do not give rise to factual inferences that could reasonably "explain" or "supplement" the terms of the contract, I also note that their lack of detail makes Marque's course of conduct allegations little more than conclusory statements. On a Rule 12(c) motion, the Court will "construe the [pleadings] in the light most favorable to the nonmoving party, but will not accept unsupported conclusory statements." *DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 262-63 (3d Cir. 2008); *see also Pastore v. Bell Tel. Co. of Pennsylvania*, 24 F.3d 508, 511 (3d Cir. 1994) ("[T]he nonmoving party cannot rely upon conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact.").

responsibility to construct, against an already steep legal climb, some reasonably consistent interpretation of the unambiguous contractual language that might support Marque's argument that the parties' course of dealings "explain" or "supplement" what the agreement plainly provides.

Finally, looking to the precedent Marque cites provides no further support to suggest that I should give credence to its peculiar construction of the agreement.  Marque's principal authority is *Glenn Distributors Corp. v. Reckitt Benckiser, LLC*, 2015 WL 9320135 (Pa. Super. Dec. 22, 2015).  As an initial matter, it was improper for Marque to cite the case.  Pursuant to the Operating Procedures of the Superior Court is has no legal authority.[19]  Furthermore, that non-precedential panel of the Superior Court did not at all address using parol evidence to explain or supplement the written terms of an agreement under § 2202.  Instead, it briefly discussed whether waiver or modification of an agreement under § 2209 and § 1303(f) was relevant to the case before it, finding it was not because, unlike here, there was no clause requiring written modifications at issue.  *Id.* at *4.  It then summarily upheld the trial court's non-§ 2209 finding of waiver by course of performance.  *Id.* at *6.  Even if *Glenn Distributors* had legal force, Marque is not claiming waiver or modification of the contract under § 2209 or otherwise, but rather that the parol evidence explains or supplements the terms of the agreement under § 2202.  Marque's other case citations are used simply to restate the law of § 2202.  Marque Br. at 7-8.  After reviewing them, I do not see either how the principles discussed provides authority for one to avoid the express terms of the contract.  I therefore find that EMD is entitled to judgment as a matter of law as to Marque's breach of its obligation to timely pay EMD on these two invoices.

---

[19] "An unpublished memorandum decision filed prior to May 2, 2019, shall not be relied upon or cited by a Court or a party in any other action or proceeding … ." 210 Pa. Code § 65.37(B).

2.  <u>The Remaining Invoices and Anticipatory Breach</u>

As to the remaining five invoices, Marque's "course of dealing" defense suffers from the same limitations and does not need to be reiterated.  However, as to the remaining invoices, Marque asserts a defense of anticipatory breach and seeks a damages setoff.  These invoices all became due *after* April 21, 2021, which is when Marque alleges that EMD communicated a bad-faith intent to withdraw from the Supply Agreement.  Counterclaim ¶¶ 40-42.  In light of this alleged repudiation, Marque argues that it was entitled to suspend its own performance pending assurance of EMD's performance under the agreement.  Marque Br. at 8-9.  Marque contends that this would excuse Marque's failure to pay on the remaining five invoices.  However, Marque's anticipatory breach defense is, in reality, merely an effort to muddy the waters of EMD's rights under the Supply Agreement and related Terms & Conditions.  For, under the unambiguous terms of the contracts and, independently, under Pennsylvania law, EMD had a right to suspend continued performance under the contract because Marque was already in material breach of the agreements with the result that EMD's suspension cannot then be interpreted as "repudiation."

In its Counterclaim, Marque details the core factual allegations that make up its anticipatory breach defense.  Specifically, that "on April 21, 2021, EMD called Marque to inform Marque that ... EMD had intentionally diverted its production/acquisition efforts and resources away from the Product and to other products."  Counterclaim ¶ 41.  Per Marque, "EMD further informed Marque that its decision to scale back its production/acquisition of the Product would immediately impact its ability to supply the Product to Marque and, as a result, that EMD was unable to fulfill Marque's Product requirements and would be cancelling outstanding RPOs that it had previously confirmed."  *Id.* ¶ 42.  Marque also alleges that "[d]uring the April 21, 2021, call, EMD did not claim that its refusal to fulfill Marque's Product requirements was at all related to any delay on the part of Marque to pay certain invoices or because EMD somehow lacked

21

production capacity to supply Marque's Product requirements." *Id.* ¶ 43.  Some time later, Marque alleges that it sent a written communication that "confronted EMD about EMD's supply issues in writing," in response to which, "EMD denied any problems and attempted to reassure Marque of EMD's ability to perform pursuant to the Agreement." *Id.* ¶ 44.  Despite this "attempt" to reassure Marque, Marque alleges that "EMD did not provide the requested adequate assurances." *Id.* ¶ 47. And soon after, "EMD informed Marque that it would be unable to supply Marque all 42,500 KGs of the Product that it had agreed to provide by the end of May,"[20] *id.* ¶ 48, "EMD also rejected an RPO [Replenishment Purchase Order] submitted by Marque without justification," *id.* ¶ 49, and finally "[o]n May 18, 2021, EMD abruptly cancelled the RPOs without justification and in violation of the agreement," *id.* ¶ 52.

EMD's Complaint is silent regarding the alleged April 21, 2021 phone call and alleged written follow-up.  The Complaint does address the May 18 RPO cancelation, specifically citing a notice letter sent on May 14, 2021, which accused Marque of breaching the Supply Agreement by failing to pay several past due invoices for which it demanded payment.  Complaint ¶ 35(b)-(c).  The letter also purported to revoke Marque's authorization to withdraw additional product from the consignment inventory, *id.* ¶ 33, canceled all outstanding RPOS, Letter of May 14, 2021, at 2, threatened to terminate the Supply Agreement *immediately* if Marque did not provide assurances of solvency pursuant to the Supply Agreement ¶ 8.2, *id.* at 3, and threatened to terminate the Supply Agreement in thirty days if Marque did not pay the outstanding invoices pursuant to the Supply Agreement ¶ 8.2, *id.* at 4.  EMD's Complaint also pleads a second letter, sent on June

---

[20] From January through April, Marque had only withdrawn 17,650 KGs of the product, or approximately 4,500 KGs per month.  *See* Complaint ¶ 47; ECF 10-1 (invoices).  It is not clear from the record whether the alleged request for 42,500 KGs was related to an anticipated increase in business usage, a normal replenishment of previously depleted consignment stock, or Marque's attempt to overfill the consignment stock, over which it had physical control, in anticipation of the parties' deteriorating relationship.  Neither the RPOs nor the forecasts discussed by either party are in the record at this time.

11, 2021 and authored by EMD's attorney in the present litigation, which asserts that from EMD's perspective the RPOs were canceled or rejected due to the failure to pay the invoices. Letter of June 11, 2021, at 4.[21]

Given this record, even reading the facts in Marque's favor, it is difficult to discern how an affirmative defense of anticipatory breach is legally sound.  Critically, throughout the entire period when Marque alleges the facts occurred that support its claim of repudiation by EMD, Marque was already in material breach of the agreement.  The terms of the Supply Agreement expressly make "[a] delay of payment by Customer" a material breach of the agreement.  Supply Agreement ¶ 8.2.  In the event of a material breach, EMD had the right to terminate the agreement if it provided proper notice and gave Marque the opportunity to cure the breach within 30 days. *Id.* More importantly, although RPOs constituted binding agreements upon confirmation by EMD, *id.* ¶ 2.2, EMD retained the right to cancel replenishment orders despite confirmation if Marque was in violation of the terms of the Supply Agreement, *id.* ¶ 5.2(c); *see also* Terms & Conditions ¶ 4.5 (permitting suspension of future deliveries in event of late payment).  Thus, both EMD's threats to terminate the agreement and actual cancelation of the confirmed RPOs were expressly within the scope of EMD's rights under the agreements and do not support an inference of wrongful repudiation.EMD's revocation of Marque's right to withdraw from the consignment inventory presents a slightly more complicated legal question, because, even though the plain language of the Supply Agreement provides a unilateral and unconstrained right for EMD to revoke Marque's authorization to withdraw, Supply Agreement ¶ 4.5,[22] that provision is

---

[21] EMD's June 11 letter was allegedly in response to a letter sent by Marque on June 8, 2021. EMD summarizes Marque's letter in its Complaint ¶¶ 38-39.  Marque admits the existence of this letter, but none of EMD's averments regarding it.  Answer ¶¶ 38-39.  Neither party has included it in the record, and I do not rely on it or on statements made about it by EMD in my findings.

[22] The only exception is bankruptcy.

potentially in conflict with EMD's duties to supply Marque with the requested product, *see id.* ¶¶ 2.2, 3.5, 3.6.  Even so, I need not address whether that provision of the contract can be applied absolutely and without cause, because here Marque was indisputably already in breach of the agreement by failing to pay its bills. "The entire contract should be read as a whole and every part interpreted with reference to the whole, so as to give effect to its true purpose." *Pritchard v. Wick*, 178 A.2d 725, 727 (Pa. 1962).  Considering the numerous rights afforded EMD to suspend performance in the event of material breach, *see id.* ¶¶ 3.5, 5.2, 8.2, 8.5; Terms & Conditions ¶ 4.5, I conclude as a matter of law that ¶ 4.5 permitted EMD to revoke Marque's right to withdraw Product when Marque was already in material breach due to non-payment.

Wholly apart from EMD's right to suspend performance under the controlling agreements, Pennsylvania appellate courts have held that "a material breach by one party to a contract entitles the non-breaching party to suspend performance." *Widmer Engr., Inc. v. Dufalla*, 837 A.2d 459, 467 (Pa. Super. 2003) (citing *Berkowitz v. Mayflower Sec., Inc.*, 317 A.2d 584, 586 (Pa. 1974)). Here, non-payment is expressly defined as a condition of material breach.[23]  Supply Agreement ¶ 8.2.  Therefore, EMD also had a common law right to suspend performance and refuse to supply Marque with further Product, both through future RPOs and by terminating Marque's right to withdraw Product from the consignment inventory.

At oral argument, Marque's counsel contended  that the May 14 letter represents a post-hoc justification for the alleged repudiation, and that having failed to state a specific reason, EMD could not assert its rights under contract.  Hearing Trans. 13:16-14:15, 20:1-25.  Counsel

---

[23] Even in the absence of the provision defining material breach under the contract, Marque's failure to pay several past due invoices plus the absence of allegations that it engaged in a good faith effort to establish a payment plan and reassure EMD of the likelihood of future payment, would have to be considered  a material breach under the common law of Pennsylvania.  *See Gamesa Energy USA, LLC v. Ten Penn Ctr. Associates, L.P.*, 217 A.3d 1227, 1231 (Pa. 2019) (adopting Restatement (Second) of Contracts § 241 to assess the materiality of breach).

characterized the letter as "pretextual," stating "[t]hat's the problem … that they walked when they wanted to.  And then they said, 'Oh no, we need to come up with a reason, let's find one.'  And that's pretextual.  And by the time they came up with a reason, EMD had [already] breached the agreement." *Id.* 33:17-23.  Marque offers no authority for the proposition that the non-breaching party has to offer a contemporaneous legal justification for non-performance following material breach of the counterparty.  Under Pennsylvania law, "[i]f a breach constitutes a material failure of performance, then the non-breaching party is discharged from all liability under the contract." *Widmer Engr., Inc. v. Dufalla*, 837 A.2d 459, 467 (Pa. Super. 2003) (citation omitted).  There are no subjective or notice-related requirements attached to the non-breaching party's right to suspend performance.[24]

Because I have found that EMD was well within its express contractual and common law rights to suspend future performance of the Supply Agreement due to Marque's continuing material breach in failing to pay EMD the amounts owing on several invoices, Marque's contention that these actions or any other communications around them constitute repudiation sufficient to justify Marque's non-payment as anticipatory breach lacks both a factual and legal basis.  Marque was in material breach of the agreement, which made EMD the aggrieved party in the transaction, and no amount of artful pleading can make it otherwise.[25]  EMD is therefore entitled to judgment as a matter of law on all amounts owing for Marque's purchases of the product.

---

[24] Indeed, under the Restatement (Second) of Contracts § 237 cmt. c, a non-breaching party can be discharged from a duty to perform under a contract even if completely ignorant of the counterparty's breach.

[25] Indeed, even were I to analyze the alleged bad faith communications as distinct from EMD's contractual rights to suspend in light of Marque's breach, I would conclude that Marque's pleadings are far from meeting the strict standard of anticipatory repudiation required by the Pennsylvania Supreme Court.  "[T]o constitute anticipatory breach under Pennsylvania law there must be 'an absolute and unequivocal refusal to perform or a distinct and positive statement of an inability to do so.'" *2401 Pennsylvania Ave. Corp. v. Fedn. of Jewish Agencies of Greater Philadelphia*, 489 A.2d 733, 736 (Pa. 1985) (quoting *McClelland v. New Amsterdam Casualty Co.,* 185 A. 198, 200 (1936).  The Third Circuit has applied this rule and, while

C.  <u>The Amount in Controversy</u>

In order to grant EMD judgment on the pleadings on Count I for the price of goods delivered plus contractual interest, it is necessary for the Court first to conclude that the invoices in the record reflect goods delivered under the Supply Agreement.  EMD summarizes the dates issued, the dates due, and the values of the outstanding invoices at Complaint ¶ 47. The invoices themselves are included in the record as Exhibit B to the Motion. ECF 10-2.  In its Answer to the Complaint, Marque does not deny the validity of the invoices nor that the invoices reflect the amount or price of goods delivered under the Supply Agreement.  Rather, Marque admits "that certain invoices remitted from EMD to Marque remain outstanding," Answer ¶ 44, and that "Marque has not remitted payment on the invoices listed in Paragraph 47 of Plaintiff's Complaint," *id.* ¶¶ 47-48. At oral argument, Marque conceded that it was "not disputing [the first] two invoices." Hearing Trans. 21:22-25. But the Court pressed the issue more broadly, referring to the

---

doing so, emphasized with italics the "absolute" and "unequivocal" nature of the refusal. *Edwards v. Wyatt*, 335 F.3d 261, 272 n.8 (3d Cir.  2003).

Marque is left with its allegations that EMD called Marque and communicated that "EMD had intentionally diverted its production/acquisition efforts and resources away from the Product and to other products," Counterclaim ¶ 41, and that "its decision to scale back its production/acquisition of the Product would immediately impact its ability to supply the Product to Marque," *id.* ¶ 42. Marque goes on to allege both that "EMD did not claim that its refusal to fulfill Marque's Product requirements was … because EMD somehow lacked production capacity to supply Marque's Product requirements," *id.* ¶ 43, and that "[w]hen Marque confronted EMD about EMD's supply issues in writing, EMD denied any problems and attempted to reassure Marque of EMD's ability to perform pursuant to the Agreement," *id.* ¶ 44.  One week later, on April 30, EMD actually confirmed three RPOs to resupply the consignment inventory.  *Id.* ¶ 50. In fact, these allegations by Marque are fundamentally inconsistent with  its defense of repudiation justifying anticipatory breach, particularly because EMD's assurances were followed by continued its continued performance under the agreement. At no point does this set of communications rise to the level of "an absolute and unequivocal refusal to perform or a distinct and positive statement of an inability to do so," *2401 Pennsylvania Ave. Corp.*, 489 A.2d at 736.

Further cutting against Marque's  claim that EMD's alleged repudiation was "absolute" and "unequivocal," in the  May 14, 2021, letter EMD expressly offered Marque the opportunity to cure the breach by paying its past due balances and providing assurances of its ability to pay for future purchases. ECF 10-2.  Had Marque cured the breach, EMD's right to unilaterally cancel the agreement would have been extinguished until the expiration of the contract's term in December 2022, Supply Agreement ¶ 8.1.

"past due invoices that had been provided by EMD" were issued "because the goods were received, they were used?" Marque's counsel replied, "Right. But remember how this was set up. This is a consignment agreement where Marque already has the supply. So Marque had the supply; [Marque] was drawing down on the supply here." Hearing Trans. 28:3-10. In short, both in its pleadings and at oral argument, Marque does not as a factual matter dispute that the invoices reflect the price for inventory it received and used. It only contests its legal obligation to pay those invoices based on its theories that the express terms of the agreements as to when payments were due should be reinterpreted based on practice, and that non-payment was justified as a response to EMD breaching the agreements. *See* Answer ¶¶ 44, 47-48; Hearing Trans. 8:18-9:4.

Because Marque has admitted the legitimacy of the invoices listed at Complaint ¶ 47, notwithstanding its legal defenses, and because I have concluded that Marque's legal defenses are not valid as a matter of law, I further conclude that Marque owes EMD for the value of the outstanding invoices which, including a credit memo, total $634,396.00.

D. Contractual Interest

The Terms & Conditions provide contractual interest of 8% per annum over the Bank of America published prime rate of interest "on all amounts due and unpaid after due date." Terms & Conditions ¶ 4.5. Marque does not contest the contractual interest provision itself or how it operates. It argues that the amounts owing need not be paid, and secondarily that the disputed due date creates uncertainty as to the date against which interest can be assessed. Marque Br. at 12. On a Rule 12(c) motion, I may consider "matters of public record," *Wolfington*, 935 F.3d at 195, and a published prime rate is within the scope of judicial notice, *Addie v. Kjaer*, 836 F.3d 251, 258 n.9 (3d Cir. 2016). Here I recognize that the Bank of America prime rate is 3.25% and has been 3.25% since March 2020, well before the alleged amounts owing became due. *See* Prime

Rate      Information,      https://newsroom.bankofamerica.com/press-kit/prime-rate-information (accessed Jan. 4, 2022) [https://perma.cc/4R24-AZ48].  Because I have found that Marque owes EMD for the unpaid invoices with payment due within sixty-days of each invoice, I conclude that EMD is entitled to contractual interest of 11.25% APR on the past due invoices.

In calculating the contractual interest due in its briefing, EMD fails to properly account for the credit memo issued by EMD on April 30, 2021.  The date of proper application of the credit memo impacts the calculation of interest owed by Marque.  In its briefing, EMD applies this credit memo against the net amount due as of filing on October 1.  However, the Terms and Conditions only permit EMD to charge contractual interest "on all amounts due and unpaid." *Id.* ¶ 4.5. As of April 30, the $36,259.00 of the credit memo was no longer an "amount due and unpaid." Applying the credit memo to the first outstanding invoice on April 30 and following the model suggested by EMD,[26] I have calculated the following prejudgment interest owed as $42,969.54:

| Invoice | Amount Due | From | To | Days | Interest |
|---------|-----------|------|-----|------|----------|
| 90767376 (Pre-Credit) | $72,680.00 | 3/9/2021 | 4/30/2021 | 52 | $1,164.87 |
| 90767376 (Post-Credit) | $36,421.00 | 4/30/2021 | 1/6/2022 | 251 | $2,817.64 |
| 90784747 | $112,654.00 | 4/4/2021 | 1/6/2022 | 277 | $9,618.03 |
| 90802636 | $65,412.00 | 5/2/2021 | 1/6/2022 | 249 | $5,020.15 |
| 90816313 | $20,769.00 | 5/17/2021 | 1/6/2022 | 234 | $1,497.93 |
| 90815484 | $43,008.00 | 5/17/2021 | 1/6/2022 | 234 | $3,101.88 |
| 90841500 | $196,236.00 | 7/2/2021 | 1/6/2022 | 188 | $11,370.94 |
| 90853492 | $159,896.00 | 7/20/2021 | 1/6/2022 | 170 | $8,378.11 |
| | | | | **Total** | **$42,969.54** |

## V.    Conclusion

For the reasons set forth above, Plaintiff EMD's Motion for Judgment on the Pleadings and Motion to Dismiss is granted in full.  Judgment will be entered in favor of EMD for the price of

---

[26] Because under the Terms & Conditions the same, non-compounding interest rate is applied against "all amounts due and unpaid," the final calculation of interest owed will be the same whether the credit memo is applied directly to one of the invoices then-owing or to all the invoices then-owing (collectively or proportionally).  In my calculations I have applied it to a single invoice as a matter of convenience.

the outstanding invoices of $634,396.00 and contractual interest of $42,969.54 for a total of $677,365.54. An appropriate order follows.

/s/ Gerald Austin McHugh
United States District Judge